THE INLET SWAMP DRAINAGE DISTRICT, Appellee, *vs.*
OLE B. ANDERSON *et al.* Appellants.

*Opinion filed February 20, 1913.*

1. DRAINAGE—*when verdict of a jury will not be set aside as
contrary to the weight of evidence.* The verdict of the jury upon
the question of benefits and damages in a proceeding to levy an ad-
ditional levee drainage assessment will not be set aside as against
the weight of the evidence, even though the evidence is conflict-
ing, where there is evidence tending to sustain the verdict and
where the jury viewed the premises and returned a verdict show-
ing a conscientious performance of its duty.

2. SAME—*when drainage case cannot be said to have been tried
upon wrong theory.* The jury trial upon the question of damages
and benefits in a proceeding to levy an additional levee drainage
assessment cannot be said to have been erroneously tried upon the
theory that the jury could consider all benefits which the land had
derived from previous work, where all of the instructions for the
objectors limit the consideration of benefits to those flowing from
the proposed additional work, and there is nothing in the record
to show that any contrary view was held by the court or followed
by the jury.

3. SAME—*what may be proved as tending to show necessity for
proposed improvement.* The question for the jury in a proceeding
to levy an additional levee drainage assessment is whether the
condition of the lands at the time of the filing of the petition for
the additional assessment was such that they would be benefited
by the proposed improvement, and as bearing upon that question it
may be shown that after constructing the original ditches, and be-
fore filing of the petition for the additional assessment, the lands
were wet, marshy and subject to overflow and that crops were im-
paired or destroyed because of insufficient drainage facilities.

4. SAME—*order directing commissioners to make additional as-
sessment is merely interlocutory.* An order of the county court
directing levee drainage commissioners, upon their own petition,
to make an additional assessment is merely interlocutory, and may
be set aside by the court at any time before final judgment con-
firming the assessment roll.

5. SAME—*what does not present any question of effect of con-
demnation judgments.* In a proceeding to levy an additional levee
drainage assessment, proof of certain condemnation petitions filed
by the commissioners under a vacated order of the court to make

another assessment does not present for review any question of the effect of the condemnation judgments, as a bar or otherwise, where there is nothing in the record to show that any such judgments were ever entered.

APPEAL from the County Court of Lee county; the Hon. ROBERT H. SCOTT, Judge, presiding.

D. W. BAXTER, and S. V. WIRICK, for appellants.

A. C. BARDWELL, for appellee.

Mr. JUSTICE COOKE delivered the opinion of the court:

This is an appeal by certain land owners from a judgment of the county court of Lee county confirming a drainage assessment against their lands in the Inlet Swamp Drainage District, in said Lee county.

The Inlet Swamp Drainage District was organized under the Levee act in 1887, and embraces approximately 30,000 acres of land. The slope of this body of land is downward towards the west, and before the organization of the drainage district about 10,000 acres in the western part thereof were during most of the year covered with water, and were known as the Inlet swamp. This swamp was the basin into which were discharged the waters from approximately 115,000 acres of land, the greater portion of this water-shed lying east of the swamp. From the eastern edge of the swamp the elevation of the land gradually increased towards the east, until in the extreme eastern part, and about five miles from the eastern edge of the swamp, it reached a height of forty-five feet above the lowest of the swamp lands. An abrupt rise of the land to the west of the swamp constituted the western boundary of the swamp area. As an outlet for the waters of the district a stream known as Inlet creek, which had cut its way through the high lands on the west side of the swamp and which emptied into Green river, was deepened and widened and

was known as the main ditch. This outlet was in the south-west corner of the district. The boundary lines are irregular, but in a general way the district may be said to comprise a body of land about four miles in width, extending in a north-easterly and south-westerly direction a distance of about eleven miles. Aside from the main ditch, the drainage system, according to the original plans, consisted of a ditch known as the "north ditch," extending along the western and northern boundary lines of the district from the main ditch, in a north-easterly and easterly direction, to the north-east corner of the district and then down the east side thereof some considerable distance, this ditch being approximately twelve miles long; also a ditch known as the "south ditch," extending from the main ditch, at its junction with the north ditch, along the south boundary line of the district, in an easterly and north-easterly direction, a distance of approximately eight miles; also a ditch known as the "middle ditch," extending from the north ditch east to the extreme eastern part of the district, the middle ditch emptying its waters into the north ditch at a point about one and one-half miles above the junction of the north ditch with the south ditch; also a ditch known as the "fourth ditch," extending from the north ditch east to a point within a mile of the eastern boundary line of the district, the fourth ditch emptying its waters into the north ditch at a point about two miles above the point where the middle ditch empties its waters into the north ditch; also thirteen laterals, varying in length from 960 to 9320 feet. The cost of constructing said ditches and laterals was estimated at $67,000, which amount was spread upon the lands of the district as the original or first assessment. This amount proving insufficient to complete the work, an additional assessment of $17,000 was made in 1889. Thereafter other additional assessments were ordered by the county court and spread against the lands of the district, as follows: In 1891 an assessment of $2800 for mainte-

nance and repairs; in 1895 an assessment of $9000 for removing bars, trees and rubbish from the ditches; in 1897 an assessment of $55,000 for widening, extending and deepening the ditches and laterals; in 1900 an assessment of $15,000 to complete the work specified in the order for the prior assessment; and in 1904 an assessment of $16,900 for removing obstructions from the ditches, straightening the channels and restoring banks which had been washed away, and $5100 for future patrol of the ditches for four years.

The construction of these ditches and laterals, and the subsequent enlargement and extension thereof and repairs thereto, having failed to provide adequate drainage for the lands in the district, the question of the reconstruction of the entire drainage system began to be agitated, and on June 20, 1908, the commissioners filed their petition in the county court of Lee county asking for an additional (or eighth) assessment of $430,699 to carry out the extensive work particularly described in the petition. Upon a hearing this petition was dismissed by the court. Thereafter, on April 26, 1909, a petition was filed by certain land owners for an additional assessment of $93,781. This petition was dismissed by the petitioners on June 28, 1909, and on the date last mentioned another petition was filed by the same land owners, including several of the appellants here, particularly specifying certain work necessary to be done in the district, and asking for an additional assessment of not to exceed $130,000 for purposes specified in the petition. On October 11, 1909, after a hearing, this petition was dismissed by the court. Thereafter, on November 30, 1909, the court, upon the petition of the commissioners, entered an order for a special assessment of $243,500. No confirmation of any assessment roll made under this order was ever had, but in June, 1911, a majority of the land owners, representing more than one-third in area of all the lands in the district, filed a petition asking that the order

of November 30, 1909, be set aside and revoked and the petition upon which said order was based be dismissed, and at or about the same time filed a petition for an additional (or eighth) assessment of $386,816 for purposes specifically set forth in the petition, and also shown by the plans, specifications and profiles of the engineer of the district which were attached to the petition. According to the estimates made by the engineer and attached to the petition more than one-third of this additional assessment is for the purpose of deepening and widening the main ditch of the district from its present outlet to a point 4.2 miles above the outlet. For the greater portion of this distance the bed of the main ditch is of rock formation, and in places the bottom width of the ditch is but twenty-five feet. A portion of the work proposed by the petition is the lowering of the bed of this ditch five feet and the widening thereof to a uniform bottom width of forty feet. It was also proposed to extend the ditch a distance of about three-fourths of a mile from its present outlet, and to deepen and widen the remainder of the main ditch and the north ditch to a point about three miles west of the eastern boundary line of the district; also to deepen and widen the south ditch and extend it further east, and to construct an additional ditch, something over two miles in length, between two points in the south ditch, as a cut-off. The proposed work also includes the deepening, widening and extension of the middle ditch and several of the laterals above mentioned. In addition to the work just enumerated, all of which involves the original ditches and laterals, it was proposed to construct new ditches as follows: A tile ditch, known as the "Kane lateral," constructed of tile varying from fifteen inches to twenty-four inches in diameter, extending east from the north ditch 3.45 miles, being between the south ditch and the middle ditch and about one-half mile south of the latter; a tile ditch, known as the "Nicholas lateral," constructed of tile varying from eighteen inches to thirty

inches in diameter, extending east from the north ditch 4.36 miles, being between the middle ditch and fourth ditch and about one-half mile north of the former and one mile south of the latter; an open ditch, known as the "town line lateral," with a base width of four feet, extending east 5.57 miles from the north ditch to a point within a short distance of the eastern boundary line of the district, being one mile north of the fourth ditch; also a tile ditch, known as the "Beech lateral," constructed of tile varying from twelve inches to twenty-two inches in diameter, extending east from the north ditch 4.05 miles, being between the town line lateral and that portion of the north ditch which extends east and west along the north boundary line of the district; also an open ditch 1.9 miles in length, with a bottom width of four feet, extending from the main ditch in a south-easterly direction, the greater portion being without the district. This was practically all the work proposed by the petition.

Numerous land owners in the eastern part of the district filed objections to the granting of the prayer of the petition last mentioned, and assigned as reasons for such objections, "that on November 30, 1909, an order was entered by this court directing the commissioners of said Inlet Swamp Drainage District to proceed, in the manner provided by law, to cause another (or eighth) assessment to raise the sum of $243,500 to be made on the lands of said district, of which the land owned by the undersigned is a part; that because of said order the proceedings of the petitioners, as shown by the third petition, for an eighth assessment herein is illegal and void;" also assigning as further grounds for their objections that their lands had attained the maximum benefits from the drainage system and that no further assessment could therefore be made against them, and further, that the proposed improvement would be of no benefit to objectors' lands, and setting up other grounds which it is not here necessary to specify. Upon

a hearing before the court these objections were overruled, and the court entered an order directing the commissioners to proceed, in the manner provided by law, to do the work and make the improvements and repairs prayed for in the petition, and to cause another (or eighth) assessment to be made on the lands of the said district to raise the sum of $386,816 for the purposes specified in the order, and that they also proceed to acquire the necessary right of way for said work. At the same time an order was entered revoking and setting aside the order of November 30, 1909, and dismissing the petition upon which that order was based. On November 29, 1911, the commissioners filed with the clerk of the county court their roll of assessments of benefits and damages. Afterwards the matter came on to be heard before a jury in said county court upon the question of benefits and damages. The commissioners offered in evidence their roll of assessments of benefits and damages and the testimony of various witnesses, which tended to show that the lands of those who are appellants in this court would be benefited by the work ordered to be done to the extent shown by the commissioners' assessment roll. Evidence was also offered by appellants which tended to show that the proposed work would not benefit the lands of some of the appellants, and that as to the lands of the other appellants the benefits would not be as great as the amounts shown by the commissioners' roll of assessments of benefits and damages. After hearing the evidence the jury proceeded to examine the lands in the district, and thereafter made out and returned into court their verdict showing the amount of benefits assessed and the amount of damages allowed against the various tracts of land in the district. A comparison of the verdict of the jury with the commissioners' assessment roll discloses the fact that the jury made an entirely new assessment of benefits against the lands of appellants, and do not appear to have followed the assessment roll made by the commission-

ers in arriving at the amount of benefits to be assessed against any tract. In some instances the benefits assessed by the jury are greater than those shown by the commissioners' roll, but in most instances they are less, and range from a very slight reduction to a reduction of over sixty-five per cent. After motions for a new trial and in arrest of judgment had been overruled the verdict of the jury was confirmed by the court, and this appeal has been prosecuted from that judgment of confirmation.

Appellants' argument has been classified by their counsel under eleven distinct propositions, presenting the various grounds relied upon by them for reversal. Most of the matters thus presented and argued do not call in question any particular ruling of the court, but seem to be based upon the assumption that the verdict of the jury was against the manifest weight of the evidence, and that the case was, over appellants' objection, tried upon the theory that the jury, in assessing the lands for benefits, were not limited to a consideration of the benefits to be derived from the work proposed by the petition under which this assessment was made, but were given to understand that they could consider all benefits which the lands had received by reason of the work theretofore done, including the construction of the original ditches of the district, and that if the total benefits received by any particular tract of land from all the work theretofore done exceeded the total assessments which had been theretofore made against that tract, then the jury might assess benefits against such tract even though it would receive no benefits from the work proposed by the petition for the eighth assessment. Thus, it is contended (1) that this proceeding is, in effect, one for the reconstruction of the drains and ditches of the district, and that appellants' lands could not be lawfully assessed to pay the cost thereof unless they would receive actual benefits from the proposed work; (2)) that the scheme of drainage evidenced by the original plans, speci-

fications and profiles had been completed in the most practicable manner, and appellants' lands could not be assessed to pay the cost of any further work not contemplated by the original plans or necessarily inferred therefrom unless such lands would be benefited by such work; (3) that in arriving at the benefits accruing to appellants' lands by reason of the proposed work appellee has no right to have taken into consideration benefits accruing to those lands prior to the time the petition for the eighth assessment was filed herein; (4) that appellants' lands cannot be assessed for the proposed reconstruction of the ditches on account of benefits in excess of prior assessments accruing to those lands from the construction and completion of the original scheme of drainage; (5) that the proposed work is not a completion of the original scheme of drainage but is a new and independent scheme of drainage for the entire district; (6) that upon the organization of the district appellants' lands did not become insurers for full and complete drainage of all the lands of the district, but were only bound to pay their proportionate part of assessments levied to carry out the original scheme of drainage and such corrections and changes as might be reasonably necessary in order to give the best results from the original plan, and that when this was accomplished no additional assessments could be levied upon the lands for reconstruction of the drainage system unless benefits would actually accrue to such lands by reason of the contemplated work; and (7) that section 59 of the Levee act provides that if, after the scheme of drainage is carried out according to the original plans in the most practicable manner, any part of the district is in need of more minute and complete drainage, sub-districts shall be organized for that purpose and the lands benefited assessed, and that this proceeding is brought for the purpose of assessing all the lands of the district for the benefit of a part thereof, which is unlawful.

We have carefully examined all the evidence in the record and find that it was conflicting upon the question whether appellants' lands would be benefited by the work proposed in the petition for the eighth assessment, and if so, to what extent. While appellants produced the greater number of witnesses who testified that the lands of most of the appellants would not be benefited and that the lands of the remaining appellants would not be benefited to the amount assessed against the same by the verdict of the jury, these witnesses consisted chiefly of appellants themselves, their tenants and members of their families, and it was the province of the jury to determine what weight should be given to their testimony. On the other hand, the testimony offered by appellee, including that of the commissioners and engineer of the district, was such as to justify the jury in finding that the lands of all of the appellants would be benefited by the proposed improvement. The taking of the testimony was completed on January 26, 1912, and the jury did not return their verdict until the fourth of the following March. A comparison of the assessment roll made by the commissioners with the assessment roll returned as the verdict of the jury shows a conscientious performance by the jury of their duty, and that the personal examination by them of the lands in the district was an important factor in making up their verdict. Under such circumstances we are not disposed to disturb the verdict of the jury on the ground that it is apparently contrary to the weight of the evidence.

As stated above, the appellants contend that the county court conducted this hearing upon the theory that their lands could be assessed for benefits, even though they would not be benefited by the proposed work, if the benefits to those lands from the work done by appellee under former assessments exceeded the total of assessments theretofore made against their lands, and counsel for appellee, in his printed brief and in his oral argument, has assumed that

the judgment of confirmation was entered on this theory, and the greater portion of his brief and argument consists of an attempt to show that the law contemplates that an additional assessment to pay the cost of improvements in a drainage district should be levied upon and assessed against the lands in the district upon that theory. An issue has been thus raised and argued exhaustively for which this record affords no foundation whatever. That the court did not adopt the theory of appellee on this question is conclusively shown by reference to the instructions which were given to the jury at appellants' request. The court gave thirty-three instructions on behalf of appellants. A considerable number of these were offered and given for the purpose of advising the jury that they could not take into consideration any benefits derived from prior work in making this assessment, and no instruction was given by the court which in anywise contradicted or modified those given on behalf of appellants on this subject. Some of the instructions given on behalf of appellants were as follows:

5. "The jury are instructed, as a matter of law, that in making the assessment against the lands of the objectors herein you have no right to take into consideration any benefits derived by said lands from the construction and operation of the present system of drainage, but that such benefits, if any, should be confined entirely to such as will be received by the construction of the proposed work."

12. "The jury are instructed that if they believe, from the evidence, including your view of the premises, that the lands of the objectors have an outlet for the surface water flowing thereon by reason of the construction and maintenance of the ditches already constructed by said Inlet Swamp Drainage District, and that they will not be benefited by any of the improvements and additional work proposed by the eighth assessment in this case, then they should not assess to such lands any benefits by reason of such proposed extension or improvement."

18. "The court instructs the jury that under the law no obligation exists between the owners of lands in a drainage district to contribute so as to effectually drain all the other lands in said district; that the only obligation which the law imposes upon the owners of lands in a drainage district is to contribute toward the payment for the original construction according to the original plans and specifications, to the extent that their lands are benefited and until the entire system is completed." .

19. "The court instructs the jury that for the purpose of determining whether the lands in question are assessed their proportionate share of the present assessment they shall not take into consideration the amount of the special assessments heretofore made by the Inlet Swamp Drainage District against said lands, but to determine whether such assessments are proportionate or not they shall consider the present assessment, only, without regard to prior assessments."

23. "The jury are further instructed that if you believe, from the evidence, that the original scheme of drainage as provided for by the original plats, plans and profiles of the original organization of the Inlet Swamp Drainage District have been carried out and fully completed by the seven assessments already made by the commissioners, then in such case an additional assessment that is sought to be made by the commissioners of said district should be predicated entirely and completely upon the basis of the benefits to be derived from the lands benefited by the construction of such proposed improvement."

It is apparent from the instructions above set out, which are only a portion of those given at the request of appellants upon the same subject, that the theory adopted by the court upon the hearing below was the very opposite of that upon which appellants contend the proceedings were conducted, and that their contention that the jury were permitted to consider benefits to the appellants' lands from the

257 — 15

work theretofore done under former assessments is wholly unfounded.

Appellants contend that the assessment roll made by the commissioners is only *prima facie* evidence of the benefits assessed when it is not attacked, and that the evidence in this case clearly shows that such assessment roll was unworthy of credence. This contention presents no matter for review except in connection with the contention that the verdict of the jury is against the manifest weight of the evidence, which we have already considered. The only instructions relating to the weight to be given by the jury to the commissioners' assessment roll were offered by appellants, and they are not in a position to complain of the action of the court in giving instructions offered by them.

It is also urged as ground for reversal that the court permitted some of the witnesses to describe the condition of the lands in the drainage district, including those belonging to appellants, as it existed before the organization of the district. Any error in that regard was corrected and cured by the seventh instruction given at the request of appellants, which was as follows:

"The jury are instructed that any testimony which has been offered in this case as to the condition of the objectors' lands herein at and before the time when this drainage district was organized should not be considered by the jury upon the question as to whether or not such lands will be benefited by the proposed improvement."

Appellants also objected to the testimony which was offered by appellee in rebuttal to show the condition of appellants' lands subsequent to the construction of the original ditches but prior to the filing of the petition for the eighth assessment, contending that any evidence showing the condition of their lands prior to the filing of said petition was incompetent and prejudicial. Appellants' witnesses had testified upon this subject, and this evidence offered by appellee was properly admitted to rebut that of-

fered by appellants. While the question before the jury was whether the condition of the lands at the time the petition for the eighth assessment was filed was such that they would be benefited by the proposed improvement, still, as tending to show what the condition of the lands was at that time with reference to their need of more drainage, it was competent to show that after the construction of the original ditches, and before the filing of the petition for the eighth assessment, the appellants' lands were subject to overflow or were wet and marshy, or that on account of insufficient drainage facilities the crops were impaired or destroyed, and this was, in substance, the evidence of which appellants complain. It was only by proof of these matters, taken in connection with their view and examination of the lands, that the jury could determine whether the condition of the lands was such at the time the petition was filed that they would be benefited by the proposed improvement.

Complaint is made of the action of the court in refusing two instructions offered by the appellants. These were the only instructions offered by the appellants which the court failed to give to the jury. They embodied the same proposition as the fifth, twelfth, eighteenth, nineteenth and twenty-third above set out, and were, in effect, mere repetitions of many instructions which were given, and for that reason they were properly refused.

It is finally contended that the order of November 30, 1909, directing the commissioners to make an additional assessment of $243,500, was a bar to this proceeding, and that the court was without jurisdiction, at a subsequent term, to revoke its order of November 30, 1909, and dismiss the petition upon which that order was based. The order of November 30, 1909, was merely interlocutory, (*Mack* v. *Polecat Drainage District*, 216 Ill. 56; *Damon* v. *Barker*, 239 id. 637;) and the court therefore had the power to vacate and set aside that order at any time before final judgment confirming the assessment roll made there-

under was entered and to dismiss the petition upon which that order was based. After that order was set aside and the former petition dismissed there was. nothing standing in the way of granting the prayer of the petition last filed.

In this connection it is also urged that after the order of November 30, 1909, had been entered, the commissioners, under the authority conferred by that order, proceeded under the Eminent Domain act to condemn certain lands of appellants; that judgments fixing the compensation for lands to be taken and damaged by the construction of the improvements specified in that order were rendered in those proceedings; that the same lands are sought to be taken for right of way in this proceeding, and that the judgments rendered in the condemnation suits were a bar to this entire proceeding, and especially a bar to any investigation in this proceeding of the amounts to be awarded to appellants as just compensation for lands to be taken or damaged by the construction of the improvements here proposed. This contention was not embraced in the objections made to the granting of the prayer of the petition herein nor was it in any way presented to the trial court. Certain petitions filed in the county court in vacation, after the December, 1909, term thereof, under the Eminent Domain act, for the condemnation of appellants' lands for right of way for ditches to be constructed under the order of November 30, 1909, were offered in evidence by appellants. The bill of exceptions fails to disclose, however, that any judgments rendered in condemnation suits were offered in evidence. Had the appellants desired to present any question involving judgments theretofore rendered in condemnation suits they 'should have offered those judgments in evidence. Having failed to do so, there is nothing in the record upon which they can base their contention that judgments rendered in certain condemnation suits were a bar to this proceeding, and especially a bar to any investigation in this proceeding of the amounts to be awarded them as just compensation

for lands to be taken or damaged by the construction of the proposed improvement.

The judgment of the county court is affirmed.

*Judgment affirmed.*